UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff*,<br><br>  v.<br><br>$9,781,900.00 OF FUNDS IN THE NAME OF FALCON STRATEGIC SOLUTIONS, *et al.*,<br><br>   *Defendants*. | Civil Action No. 22-898 (RDM) |

**MEMORANDUM OPINION**

  This is an *in rem* action seeking forfeiture of funds that were blocked while being electronically transferred from the United Arab Emirates to Serbia. During the wire transfer, the funds passed through a New York bank that blocked them on the grounds that their intended recipient was a front for a sanctioned entity. Subsequently, the United States sought forfeiture of the blocked funds pursuant to 18 U.S.C. § 981, alleging that they were "sent through a network that circumvented U.S. sanctions" in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705 *et seq*. Calidus, LLC ("Calidus")—the Emirati entity that had initiated the transfer—then filed a verified claim of interest asserting ownership over the blocked funds and seeking their return.

  After Calidus filed its claim and answer, the government moved to strike the claim on the ground that Calidus lacks standing pursuant to Rule G(8)(c)(i)(B) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules" or "Supp. R."). The Court denied that motion without prejudice, Dkt. 33, noting that the parties had failed

1

to address a potentially controlling decision of the D.C. Circuit, *Estate of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416 (D.C. Cir. 2022); Dkt. 33 at 8–11.  The Court requested that, should the government renew its motion, the parties address what effect, if any, *Levin* has on the present litigation.  Dkt. 33 at 12.

Currently before the Court is the government's renewed motion to strike, Dkt. 36.  For the reasons explained below, the Court will **GRANT** the United States' motion to strike Calidus's claim for lack of standing.

## I.  BACKGROUND

The factual and statutory background relevant to this motion is set forth in the Court's Memorandum Opinion and Order of February 28, 2025, which denied the government's first motion to strike.  *See* Dkt. 33.  The Court will briefly restate the most pertinent facts.

Claimant Calidus is an Emirati "defense-focused technology development and manufacturing company."  Dkt. 9 at 3 (capitalization altered).  As part of its dealings with Sloboda AD ("Sloboda"), "Serbia's state arms manufacturer," Calidus initiated, at Sloboda's request, an electronic funds transfer ("EFT") totaling $582,000 (the "Funds") to Falcon Strategic Solutions ("Falcon").  *Id.* at 4.  Calidus represents that it was told by Sloboda that Serbian law required that Sloboda and other Serbian entities transact export business through Falcon, a Serbian trading company.  *Id*.

Calidus initiated the EFT through its bank in the United Arab Emirates, First Abu Dhabi Bank ("FAB").  *Id.* at 4–5, 9, 12.  As the entity initiating the transfer, Calidus is known as the "originator" of the funds, while the intended ultimate recipient, Falcon, is the "beneficiary."  *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 935–36 (D.C. Cir. 2013) (explaining the EFT process).  When an originator and beneficiary do not share the same bank and their banks are not

part of the same lending consortium, the originator's bank must route the EFT through a third bank, called an intermediary or correspondent bank. *See United States v. Sum of $70,990,605* ("*$70,990,605 I*"), 128 F. Supp. 3d 350, 354 (D.D.C. 2015). Here, FAB routed the money through a U.S.-based correspondent bank, Deutsche Bank Trust Company Americas ("Deutsche Bank"), located in New York. Dkt. 9 at 5. Upon receipt of the Funds, Deutsche Bank blocked their continued transfer and has maintained control over the Funds since. *Id.* at 4–5; *see* Dkt. 1 at 10 (Compl. ¶ 32).

The blocking occurred because the Department of Treasury's Office of Foreign Assets Control ("OFAC") had identified Falcon as a front company for a designated sanctioned entity pursuant to IEEPA and Exec. Order No. 13,818, 82 Fed. Reg. 60839–43 (Dec. 20, 2017). Dkt. 1 at 2, 5–6 (Compl. ¶¶ 1, 13–15). When the OFAC designates a sanctioned entity under this authority, it prohibits "any U.S.-dollar transactions" occurring "in whole or in part in the United States" involving the designated entity. *Id.* at 5 (Compl. ¶ 14) (citing Notice of OFAC Sanctions Actions, 82 Fed. Reg. 61,665 (Dec. 28, 2017)). Thus, if any sanctioned entity's property or interests in property "come into the United States, or come within the possession of a United States person," the property is "blocked and may not be transferred." *Id.* at 4 (Compl. ¶ 6); Exec. Order No. 13,818, 82 Fed. Reg. at 60839–40. As a result, U.S. banks are required to block any EFTs associated with these entities, as occurred when Calidus attempted to transfer the Funds to Falcon via a correspondent bank located in the United States.

Subsequent to Deutsche Bank blocking the Funds, the government initiated the current forfeiture action pursuant to 18 U.S.C. § 981. Dkt 1 at 2–3 (Compl. ¶¶ 1–2). After receiving notice of the forfeiture action, Calidus filed a verified claim and answer contesting the government's forfeiture of the Funds by claiming to be their "legal owner." *See* Dkt. 9 at 1–2.

3

The government now moves for a second time to strike Calidus's verified claim pursuant to Supplemental Rule G(8)(c)(i)(B) for lack of standing, Dkt. 36, and Calidus opposes the government's motion, Dkt. 38.

## II.  LEGAL STANDARD

"An '*in rem*' action is [an] action in which the named defendant is real or personal property, . . . and [it] determines rights to the property . . . not merely among [the parties], but also against all persons at any time claiming interest in that property."  1A C.J.S. *Actions* § 99 (May 2025 Update) (footnote omitted).  Civil forfeiture is a classic *in rem* proceeding, where the defendant property is the property subject to forfeiture.  "The typical [civil] forfeiture action begins when the government files a verified complaint against the property . . . .  As plaintiff, the government bears the ultimate 'burden of proof . . . to establish, by a preponderance of the evidence, that the property is subject to forfeiture.'"  *United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in U.S. Currency*, 859 F.3d 1085, 1088 (D.C. Cir. 2017) (third alteration in original) (quoting 18 U.S.C. § 983(c)(1)).

Federal civil forfeiture proceedings are governed by 18 U.S.C. § 983 and the Supplemental Rules.  Once the government files a complaint for forfeiture *in rem*, "any person claiming an interest in the seized property may file a claim asserting such person's interest."  18 U.S.C. § 983(a)(4)(A); Supp. R. G(5)(a).  In response, the government "may move to strike" such a claim by alleging that the "claimant lacks standing."  Supp. R. G(8)(c)(i)(B).  In opposing a motion to strike, the claimant must establish by a preponderance of the evidence both constitutional and statutory standing.  *Id.* G(8)(c)(ii)(B); *$17,900.00 in U.S. Currency*, 859 F.3d at 1089.

Here, the government challenges only Calidus's constitutional standing. Dkt. 36 at 16. The constitutional standing requirements "to challenge a forfeiture are very forgiving." *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015) (citation modified). In civil forfeitures, constitutional standing "turns upon whether the claimant has a sufficient interest in the property to create a case or controversy." *United States v. 8 Gilcrease Lane, Quincy, Fl. 32351*, 641 F. Supp. 2d 1, 6 (D.D.C. 2009) (quoting *United States v. Real Prop. Located at 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004)). Typically, courts and parties rely on an ownership or possessory interest to establish standing. *See $17,900.00 in U.S. Currency*, 859 F.3d at 1090. "[A]ny colorable claim on the property suffices," however, "if the claim of injury is 'redressable, at least in part, by a return of the property.'" *Emor*, 785 F.3d at 676 (quoting *United States v. 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002)).

Standing "must be supported . . . with the manner and degree of evidence required at [each] successive stage[] of the litigation." *$17,900.00 in U.S. Currency*, 859 F.3d at 1090 (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Here, the government's motion to strike is "presented as a motion for judgment on the pleadings." Supp. R. G(8)(c)(ii)(B); *see* Dkt. 36 at 9. "At the pleading stage, a claimant need only *allege* a colorable interest in the property." *$17,900.00 in U.S. Currency*, 859 F.3d at 1090 (emphasis in original). Accordingly, the Court will "accept as true all of the factual allegations contained in the claim, construe the claim liberally in the claimant['s] favor, and grant the claimant[] the benefit of all inferences that can be derived from the facts alleged." *United States v. Sum of $70,990,605* ("*$70,990,605 II*"), 234 F. Supp. 3d 212, 223 (D.D.C. 2017) (citation modified). "But the Court need not accept the claimant['s] legal conclusions, or draw inferences that are not supported by the facts alleged in the claim." *Id.* (citation omitted). "If a claim fails on its face to

5

show facts that support claim standing, the claim can be dismissed by judgment on the pleadings." Supp. R. G(8)(c) advisory committee's note.

### III. ANALYSIS

In both its first and second motions to strike, the government lays out the same basic argument in the following steps: First, for Calidus to have constitutional standing to intervene in this forfeiture action, Calidus must have a property interest in the Funds. Dkt 21-1 at 10; Dkt. 36 at 9–10. Second, because Calidus cannot identify any pertinent federal basis for its property interest, Calidus must rely on state law. Dkt 21-1 at 11; Dkt. 36 at 11–12. Third, the applicable state law is that of New York, where the blocked funds are located, and New York applies Article 4A of the New York Uniform Commercial Code ("UCC") to determine property interests in mid-EFT funds. Dkt. 21-1 at 14; Dkt. 36 at 12–13. Fourth, under UCC Article 4A, Calidus has no colorable ownership interest in the funds. Dkt. 21-1 at 14–16; Dkt. 36 at 16–19. Therefore, the government concludes, Calidus lacks constitutional standing to be a claimant in this forfeiture action. Dkt. 21-1 at 16; Dkt. 36 at 18.

In its memorandum opinion denying the government's first motion to strike, the Court instructed the parties to address in any renewed motion "why the UCC remains the appropriate reference in OFAC cases following *Levin*," Dkt. 33 at 10, and what the Court should make of "the D.C. Circuit's conclusion in *Levin* that OFAC blocking and the UCC are 'incompatible,'" *id.* at 11 (quoting *Levin*, 45 F.4th at 663). Having considered the parties' briefing on that question, the Court now concludes that *Levin* is not controlling here under federal common law principles. As a result, due to an admittedly odd confluence of state and federal law, Calidus lacks constitutional standing.

A.     *Heiser* and *Levin*

In order to assess the impact of *Levin* on the present litigation, the Court begins with *Heiser*, an earlier D.C. Circuit opinion addressing a similar fact pattern. *Heiser* was brought by plaintiffs who had previously obtained default judgments against Iran for its involvement in a terrorist attack. 735 F.3d at 935. To satisfy those judgments, the plaintiffs sought to attach various funds that had been blocked mid-EFT pursuant to OFAC regulations by U.S.-based intermediary banks. *Id.* Critically, Iran's only connection to the blocked funds was as the owner of the beneficiaries' banks—not as any transfer's originator or ultimate beneficiary. *Id.* at 936. To attach the funds, the plaintiffs invoked 28 U.S.C. § 1610(g) of the Foreign Sovereign Immunities Act ("FSIA § 1610(g)") and § 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note (Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism) ("TRIA § 201"), which authorize the attachment of "'the property of a foreign state'" or "'the blocked assets of [a] terrorist party'" for purposes of executing a judgment, *Heiser*, 735 F.3d at 937 (alteration in original) (first quoting FSIA § 1610(g); and then quoting TRIA § 201). Thus, the central question in *Heiser* was whether the blocked funds, which were intended to pass through an Iranian-controlled bank on their way between two non-Iranian parties, were "the 'property' or 'blocked assets' *of* Iran." *Id.* at 938 (emphasis in original).

The D.C. Circuit first explained that the term "of," as used in the FSIA and TRIA, connotes an ownership interest in the relevant property. *Id.* at 938–40. Then, observing that "Congress has not provided a rule for determining ownership under [the statutes]," the circuit concluded that it was required to "fashion a 'rule of decision' for applying § 201's and § 1610(g)'s ownership requirement, and that rule, though federal, may sometimes 'follow state

7

law.'" *Id.* at 940 (quoting Henry J. Friendly, *In Praise of* Erie—*and of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 410 (1964)). In the view of the *Heiser* court, "[UCC] Article 4A provide[d] an appropriate rule of decision" for purposes of "applying the ownership requirements of § 201 and § 1610(g)." *Id.* at 940–41. Applying that "rule of decision," the *Heiser* court concluded that Iran, as the owner of the beneficiaries' banks, did not own the blocked funds and that they could not be attached under the FSIA or TRIA. *Id.* at 941.

*Levin* also addressed the attempted attachment of OFAC-blocked funds. There, members of the Iranian Revolutionary Guard Corps, a sanctioned entity, attempted to transfer funds that were ultimately blocked mid-EFT by a bank in New York. *Levin*, 45 F.4th at 417–18. The plaintiffs, also seeking to execute judgments against Iran, attempted to attach the funds pursuant to FSIA § 1610(g) and TRIA § 201(a). *Id.* at 419. And as in *Heiser*, the issue before the *Levin* court was whether the blocked funds were "of" the sanctioned entity. *See id.* at 420.[1] However, in *Levin* the terrorist party was the *originator* of the EFT, rather than the owner of the beneficiaries' banks.

Without disclaiming *Heiser*'s holding, the *Levin* court declined to apply the UCC as the appropriate rule of decision to determine whether Iran had a property interest in the funds. *Id.* at 421. The circuit emphasized that the issues in the two cases were distinct, and "when federal courts incorporate state law as federal common law, such incorporation must be done 'as to a single issue at a time.'" *Id.* (quoting Paul J. Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision,* 105 U. Pa. L. Rev. 797, 804–06 (1957)). Because *Heiser* addressed the sufficiency of a *beneficiary bank's*

---

[1] The *Levin* court phrased the ownership question slightly differently than in *Heiser*: whether the sanctioned entity had a "sufficient property interest" to support attachment under the TRIA. 45 F.4th at 420.

*owner's* property interest, while *Levin* addressed the sufficiency of an *originator's* property interest, the court was not constrained by *Heiser*'s incorporation of the UCC.  *See id.* ("*Heiser* did not settle whether U.C.C. Article 4A, or any provisions of it, would apply in a case such as this as matter of 'federal common law.'" (citation omitted)).

Thus, to resolve the distinct question of whether to "incorporate state law as federal common law" under the circumstances posed in *Levin*, the circuit "consider[ed] whether the issue's outcome [would be] consistent with the federal program" set out by the TRIA.  *Id.* (citation modified).  As such, the court determined that it "may use Article 4A if and only if, on the issue presented, doing so would be consistent with TRIA § 201."  *Id.*  Ultimately, *Levin* held that UCC Article 4A conflicted with the goals of the TRIA because Article 4A "seeks to minimize disruptions in electronic funds transfers, [while] OFAC's blocking does the opposite— its purpose is to disrupt terrorist electronic fund transactions."  *Id.* at 422.  Thus, rejecting the incorporation of Article 4A to resolve the statutory construction issue, the court instead adopted a "'tracing rule[].'"  *Id.* at 423 (quoting *Luis v. United States*, 578 U.S. 5, 22 (2016) (plurality opinion) (per curiam)).  Implementing the tracing rule, the court found that the funds were "traceable to" the sanctioned originator, meaning that that entity had a sufficient property interest in the funds to permit attachment under TRIA § 201(a), and that "no intermediary or upstream bank assert[ed] an interest as an innocent third party." *Id.*  "Because the funds [could] be attached using the TRIA," the *Levin* court did not address "whether attachment [was] permissible under § 1610(g) of the FSIA." *Id.* at 423 n.19.

In combination, *Heiser* and *Levin* thus create disparate rules of decision for TRIA claims based on where the sanctioned entity is positioned within the EFT chain and whether the rule of decision conflicts with the relevant statutory purpose.  In *Heiser*, where the sanctioned entity was

9

the owner of the beneficiaries' banks, the D.C. Circuit applied the UCC to conclude that the entity lacked a sufficient ownership interest for the victims to attach the funds. *See* 735 F.3d at 940–41. On the other hand, in *Levin*, where the sanctioned entity was the originator, the circuit applied a tracing rule to determine that the entity had a sufficient property interest such that the victims could attach the funds. *See* 45 F.4th at 423–24. And while neither case addresses standing, both cases address concepts of ownership or property interest. Both *Heiser* and *Levin* are thus potentially relevant to the instant case, in which the Court must determine whether Calidus has a cognizable property interest in the Funds, sufficient to give it standing in an *in rem* forfeiture action.

Ultimately, however, neither *Heiser* nor *Levin* resolves the present controversy. The analysis at the heart of both *Heiser* and *Levin* focuses on identifying a rule of decision to fill a gap in a federal statute. *See Heiser*, 735 F.3d at 940 (noting that because Congress had not "provided a rule for determining ownership under § 201 or § 1610(g)" nor "directed the federal courts to adopt state ownership rules," the court's role was to fill the gap in the federal statutes); *Levin*, 45 F.4th at 421 ("*Heiser* did not settle whether U.C.C. Article 4A, or any provision of it, would apply in a case such as this as matter of 'federal common law.'" (citation omitted)). Thus, while both cases address ownership or property interests in OFAC-blocked assets, those interests are cabined within the context of the relevant federal statutes. In this way, *Heiser* and *Levin* are similar to *$70,990,605 II*, where this Court held that "the statutory definition of 'owner' is limited to the question of who may file a claim under § 981(k) . . . . It does not purport to create or to transfer any substantive property right." 234 F. Supp. 3d at 227. Just as the definition of "owner" in § 981 is limited to determining statutory standing, neither *Heiser*'s incorporation of

the UCC nor *Levin*'s tracing rule necessarily applies to contexts outside of the statutory issues presented in those cases.

In Calidus's view, *Levin* nonetheless counsels against the UCC applying to any case involving OFAC blocking regulations. Dkt. 38 at 9–10. Other decisions and sources have expressed a similar view. *See* 25A Mass. Prac., *Manual on Unif. Com. Code* § 4A:5 (3d ed. Aug. 2025 Update) ("[The D.C. Circuit] clarified [in *Levin*] that § 4A-402 may not be used to disrupt electronic funds transfers, as the purpose of § 4A-402 is to minimize disruptions in electronic funds transfers. . . . [T]he [c]ourt made clear that the incompatibility with § 4A-402 would apply in any situation that seeks to disrupt an electronic funds transfer."); *Ekopel D.O.O. v. Citibank, N.A.*, 717 F. Supp. 3d 17, 29 n.7 (D.D.C. 2024) ("The [c]ourt recognizes that Article 4-A's wire transfer rules may be preempted to the extent they are inconsistent with OFAC blocking regulations." (citing *Levin*, 45 F.4th at 422–23)). These readings of *Levin* seem to stem at least in part from the *Levin* court's reference to Commentary No. 16 from the Permanent Editorial Board for the UCC, which states that "unless there is superseding federal law, such as a drug forfeiture law or a regulation of the [OFAC], Article 4A must be honored." Permanent Ed. Bd. for the Unif. Com. Code, *Commentary No. 16 Sections 4A-502(d) and 4A-503*, at 5 n.3 (2009).

This Court acknowledges that UCC Article 4A and the OFAC blocking regulations seem to work at cross purposes. Indeed, were the Court called upon to fashion a common law rule of decision based on the relevant policy considerations, application of the UCC might not be its first choice because, as the Court previously noted, it is odd to suggest that "an originator of blocked funds has a sufficient ownership interest to satisfy a judgment entered pursuant to the [TRIA], but would lack a sufficient ownership interest to challenge an OFAC order blocking the transfer of funds held at an intermediary bank." Dkt. 33 at 10–11. In the instant case, however, the issue

11

presented does not turn on the recognition of a federal common law rule of decision. Although this case is also brought under a federal statute, 18 U.S.C. § 981, the specific issue at hand—the question of Calidus's standing—does not require filling a gap in that statute. Instead, it is a question of constitutional principles turning on the existence of a property interest in the Funds. The Court is unaware of any precedent applying federal common law to establish a property interest to support constitutional standing in an *in rem* proceeding such as this one. To the contrary, as discussed below, federal courts have uniformly applied state law to define the relevant property interests for standing in *in rem* actions. *See, e.g.*, *United States v. 5 S. 351 Tuthill Rd.*, 233 F.3d 1017, 1021 (7th Cir. 2000) ("State law defines and classifies property interests for purposes of the forfeiture statutes, while federal law determines the effect of the property interest on the claimant's standing.").

Thus, *Levin*'s rule of decision for TRIA § 201 and rejection of the UCC in its analysis are not controlling for present purposes, just as *Heiser*'s embrace of the UCC as a rule of decision is not controlling. In short, the question of whether the Funds are the property "of" a terrorist entity for the purpose of TRIA § 201 is not presented by this case, where no party seeks to satisfy a judgment against a terrorist party.

**B.     Standing**

Having concluded that *Levin* does not control, the Court proceeds to assess Calidus's constitutional standing using the standard method for federal *in rem* proceedings. The "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, requires that the relevant party "show that (i) it has suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision," *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) (citation modified); *Lujan*, 504 U.S. at 560–61. The claimant bears the

12

burden of establishing standing in an *in rem* forfeiture action. Supp. R. G(8)(c)(ii)(B); *$17,900.00 in U.S. Currency*, 859 F.3d at 1089. As discussed above, for civil forfeitures, constitutional standing "turns upon whether the claimant has a sufficient interest in the property to create a case or controversy." *8 Gilcrease Lane, Quincy, Fl. 32351*, 641 F. Supp. 2d at 6 (citation omitted). "In general, any colorable claim on the property suffices, if the claim of injury is 'redressable, at least in part, by a return of the property.'" *Emor*, 785 F.3d at 676 (citation omitted).

    1.    *Injury in fact: "legally protected interest"*

Calidus has failed to allege a cognizable injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan*, 504 U.S. at 560 (citation modified). Calidus asserts an ownership interest in the Funds which, if legally sound, would readily suffice for constitutional standing. Dkt. 9 at 2; *see $17,900.00 in U.S. Currency*, 859 F.3d at 1089–90. The problem is that its theory of ownership fails as a matter of law.

In federal *in rem* forfeiture actions, courts apply a two-step process to evaluate claims to the defendant property, in which state law defines the applicable property interest and federal law determines the effect of that interest on standing. *See, e.g.*, *5 S. 351 Tuthill Rd.*, 233 F.3d at 1021; *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 33 (1st Cir. 1999) (using "a two step process" in a federal forfeiture case because "[s]tate law determines [a claimant's] ownership interest . . . but then federal law determines the effect of his ownership interest on his right to bring a claim"); *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003) (applying state law to determine ownership interest, before concluding that the claimant had constitutional standing); *United States v. $100,348 in U.S. Currency*, 354 F.3d 1110,

13

1119 (9th Cir. 2004) ("In a forfeiture action, we look to state law to determine the 'existence and extent' of a claimant's property interest." (citation omitted)); *United States v. All Assets Held at Bank Julius*, 480 F. Supp. 3d 1, 13 (D.D.C. 2020) ("The nature of a claimant's asserted property interest is defined by the law of the State . . . in which the interest arose." (citation modified)). This practice of turning to state law to determine the existence of a property interest aligns with the familiar default rule established by *Erie R.R. Co. v. Tompkins*: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."  304 U.S. 64, 78 (1938).

Here, Calidus fails to identify any constitutional or federal statutory provision giving rise to a property interest.  Accordingly, the Court must default to state law, and the applicable state law is that of New York, where the Funds are located.  *See, e.g.*, *United States v. BCCI Holdings (Lux.), S.A.*, 980 F. Supp. 21, 22, 26–28 (D.D.C. 1997) (applying New York state law where a correspondent bank located in New York blocked the EFT); *United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39, 44–45 (D.D.C. 2020) (same); *Ekopel*, 717 F. Supp. 3d at 28 (same).  Under New York law, "Article 4-A of the UCC furnishes 'the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation [it] cover[s].'"  *Receivers of Sabena SA v. Deutsche Bank A.G.*, 36 N.Y.S.3d 95, 96–97 (N.Y. App. Div. 2016) (alterations in original) (quoting N.Y. U.C.C. Law § 4-A-102 official comment); *see also* N.Y. U.C.C. Law § 4-A-102 (McKinney) ("Except as otherwise provided in Section 4-A-108, this Article applies to funds transfers defined in Section 4-A-104."); *id.* § 4-A-104(1) (defining "funds transfers" as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order").  New York law is clear, moreover, that under Article 4A an originator has no ownership interest in a mid-stream

14

EFT. *See, e.g.*, *Sabena*, 36 N.Y.S.3d at 106 ("[T]he funds in transit are not the property of either originator or beneficiary."); *Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009) (same). As such, under New York law, Calidus lacks a legally cognizable ownership interest in the Funds to support standing.

Calidus objects that its failure to demonstrate a property interest under New York law should not affect its standing because it has identified a separate federal statutory claim to ownership of the Funds under 18 U.S.C. § 981. Dkt. 38 at 13–14. A provision of Section 981 does indeed permit intervention by the "owner" of the seized funds in a federal civil forfeiture proceeding and defines "owner" as "a person with an ownership interest in the specific property sought to be forfeited." 18 U.S.C. §§ 981(k)(3), 983(d)(6)(A). But, unlike the portions of the FSIA and TRIA at issue in *Heiser* and *Levin*, the language of Section 981 does not invite the Court to establish a rule of decision to determine ownership as a matter of federal common law. First, the quoted subsection of Section 981 deals specifically with forfeitures under a statutory scheme that allows the government to treat funds deposited in accounts in *foreign* financial institutions as if they had been deposited in an interbank account in the United States for the purpose of forfeiture. *Id.* § 981(k)(1)(A). That provision is not implicated by this case, as the government's theory of forfeiture here does not rely on treating the Funds as fungible with other funds deposited in an FAB account abroad that might be subject to forfeiture for any reason beyond Calidus's attempt to transfer money to Falcon. *See* Dkt. 1 at 8–10 (Compl. ¶¶ 31–33). As the government emphasizes, "were Section 981(k) not in the U.S. Code, the United States' forfeiture claims in this case would be wholly unaffected." Dkt. 40 at 15–16. Second, even if it were relevant, this Court has already explained that Section 981 defines an "owner" in federal civil forfeiture actions only for the purpose of statutory standing, and it "does not purport to

15

create or to transfer any substantive property right." *$70,990,605 II*, 234 F. Supp. 3d at 227.  As such, Section 981 cannot support Calidus's claim to a property interest in the Funds sufficient for constitutional standing.

That leaves Calidus's argument that *Levin* categorically forestalls the application of the UCC to determine an originator's ownership of funds seized pursuant to the OFAC's regulatory scheme.  Dkt. 38 at 9–10.  As the Court explained above, *Levin*'s analysis of the UCC's compatibility with OFAC blocking procedures arose in the context of selecting an appropriate rule of decision as a matter of federal common law—to fill a gap in federal statutes that are not at issue in this case.  *See* 45 F.4th at 421–22.  The Court's inquiry here is fundamentally different.  The Court does not adopt UCC Article 4A as a matter of federal common law, which might require assessing whether the UCC as a rule of decision was compatible with the relevant federal program, but instead applies New York's law to discern whether Calidus has a cognizable property interest in blocked funds.  The distinction between the two analyses is made evident by *Heiser*'s treatment of the UCC in a context in which the D.C. Circuit *did* endorse the UCC as a rule of decision as a matter of federal common law.  In *Heiser*, the court specified that it was not "hold[ing] that [the District of Columbia's] *or any state's version of* [UCC] Article 4A applies of its own force."  735 F.3d at 940 (emphasis added).  Instead, the court held that "Article 4A is a proper federal rule of decision" under the relevant portions of the FSIA and TRIA.  *Id.* at 940–41.  Here, by contrast, the Court is not adopting the UCC in the abstract, divorced from any particular state's interpretation of it, as a rule of decision.  The Court instead applies New York law, whatever it happens to be.  If New York had not adopted the UCC, but instead used a different method to assess Calidus's property interest in the Funds, the Court would follow its lead.

16

Lacking an ownership interest protected by New York state law, and without another legal source to support its ownership interest, Calidus's alleged ownership interest in the Funds cannot give it standing.

2. *Injury in fact: other basis for injury*

Calidus also maintains that it has standing to challenge the forfeiture under more general Article III principles, as a party involved in the EFT that was blocked by government action. Dkt. 38 at 11–12. That argument fails to appreciate the nature of an *in rem* forfeiture action. The question before the Court is not whether Calidus might have Article III standing to, for example, bring an Administrative Procedure Act claim challenging the blocking of the funds as final agency action. As explained above, in the particular circumstances of an *in rem* civil forfeiture proceeding, the action is "brought against property, not people," and the Court's role is to exercise "authority over the property" and to "adjudicate claims of ownership." *United States v. All Funds in Acct. Nos. 47.034/278, 747.009/278, & 747.714/278 in Banco Espanol de Credito, Spain*, 295 F.3d 23, 25 (D.C. Cir. 2002). Consequently, any attempt by Calidus to assert standing by means other than invoking a "colorable claim on the property" faces substantial hurdles. *Emor*, 785 F.3d at 676.

To be sure, as the government concedes, an interest in the property other than an ownership interest might suffice for constitutional standing. Dkt. 40 at 17 (citing *United States v. Fifteen Thousand Five Hundred Dollars*, 558 F.2d 1359, 1361 (9th Cir. 1977)); *see also United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527–28 (2d Cir. 1999). Calidus, however, has failed to develop any theory of a legally recognizable interest in the Funds other than the claim of ownership, which the Court has rejected above. In its amended verified claim, Dkt. 9, Calidus asserted that the basis for its interest in the Funds was that it was their "legal owner", *id.* at 2 ("With respect to those $582,000.00 in funds, Calidus states that it is the legal owner."), and, for

17

relief, it asks the Court to "reinstate[] []its rightful interest in [the Funds]," *id.* at 7.[2]  Calidus also has not elucidated any theory that it would have reacquired the Funds but for their seizure and forfeiture to the government.  *Cf. Emor*, 785 F.3d at 676 (finding constitutional standing to challenge a forfeiture where the party claimed "it would have reacquired its property had the property not been forfeited to the government").

While "the requirements for a [claimant] to demonstrate constitutional standing to challenge a forfeiture are very forgiving," *id.* (citation modified), Calidus has failed to allege any qualifying legally cognizable interest in the Funds.  The Court thus concludes that Calidus lacks standing to intervene in the instant forfeiture action.

*    *    *

In closing, the Court again acknowledges that the result in this case is an odd one.  While the D.C. Circuit has held in *Levin* that "an originator of blocked funds has a sufficient ownership interest to satisfy a judgment entered pursuant to the [TRIA]," Dkt. 33 at 10, the Court here finds that an originator "lack[s] a sufficient ownership interest to challenge an OFAC order blocking the transfer of funds held at an intermediary bank," *id.* at 11.  But this different result flows from the distinct legal principles at play in each case.  The *Levin* court had the freedom to embrace federal common law and adopt its tracing rule in order to fill a gap in a federal statute through the creation of a rule of decision.  In the instant case, the Court lacks similar flexibility, because "[t]here is no federal general common law," *Erie R.R. Co.*, 304 U.S. at 78, and federal courts

---

[2] In reply to both the government's first and second motions to strike, Calidus also asserts in passing that it has a "financial stake" in the funds. Dkt. 23 at 15; Dkt. 38 at 13.  To the degree that this claimed "financial stake" is intended to refer to anything other than Calidus's claim of ownership of the funds, that argument is underdeveloped, and therefore waived.  *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (an argument mentioned only "in the most skeletal way, leaving the court to do counsel's work" is forfeited (citation modified)).

may only fashion federal common law rules in "narrow" circumstances, *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981), none of which are applicable here. Lacking any basis to depart from the ordinary practice of applying state law to determine property interests in federal *in rem* forfeiture proceedings, the Court must apply a contrary rule and accept a contrary outcome.

## CONCLUSION

For the reasons explained above, the Court will **GRANT** the government's renewed motion to strike, Dkt. 36.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: December 3, 2025